**Slip Op. 05-123**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____

|  |  |  |
|---|---|---|
| CRAWFISH PROCESSORS ALLIANCE; LOUISIANA DEPARTMENT OF AGRICULTURE AND FORESTRY; BOB ODOM, COMMISSIONER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | Consol. Court No. |
| | : | 02-00376 |
| HONTEX ENTERPRISES, INC., d/b/a LOUISIANA PACKING COMPANY; QINGDAO RIRONG FOODSTUFF CO., LTD. and YANCHENG HAITENG AQUATIC PRODUCTS & FOODS CO., LTD; BO ASIA, INC., GRAND NOVA INTERNATIONAL, INC., PACIFIC COAST FISHERIES CORP., FUJIAN PELAGIC FISHERY GROUP CO., QINGDAO ZHENGRI SEAFOOD CO., LTD. and YANGCHENG YAOU SEAFOOD CO., | : | |
| | : | |
| Defendant-Intervenors and Plaintiffs. | : | |

_____

[The United States Department of Commerce's Final Remand Results are remanded.]

Adduci, Mastriani & Schaumberg, L.L.P. (Will E. Leonard and John C. Steinberger) for Crawfish Processors Alliance, Louisiana Department of Agriculture and Forestry, and Bob Odom, Commissioner, plaintiffs.

Coudert Brothers LLP (John M. Gurley and Matthew J. McConkey) for Hontex Enterprises, Inc., d/b/a Louisiana Packing Company, defendant-intervenor and plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand); of counsel: Marisa Beth Goldstein, Office of Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

Date: September 13, 2005

**OPINION**

**STANDARD OF REVIEW**

The Court will uphold the United States Department of Commerce's ("Commerce") redetermination pursuant to the Court's remand unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the [same] evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a (2000) and 28 U.S.C. § 1581(c) (2000).

## BACKGROUND

The relevant facts and procedural history in this case are set forth in the Court's remand opinion, Crawfish Processors Alliance v. United States, 28 CIT ___, 343 F. Supp. 2d 1242 (2004), of which familiarity is presumed.  A brief summary is also included here. On April 22, 2002, Commerce issued its final results of the antidumping duty administrative review on freshwater crawfish from the People's Republic of China covering the period of review ("POR") from September 1, 1999, through August 31, 2000.  See Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Recission of Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China ("Final Results"), 67 Fed. Reg. 19,546 (Apr. 22, 2002). Plaintiffs, Crawfish Processors Alliance, Louisiana Department of Agriculture and Forestry, and Bob Odom, Commissioner (collectively, "CPA") and defendant-intervenors and plaintiffs, Hontex Enterprises, Inc., d/b/a Louisiana Packing Company ("Hontex"), Qingdao Rirong Foodstuff Co., Ltd., Yancheng Haiteng Aquatic Products & Foods Co., Ltd., Bo Asia, Inc., Grand Nova International, Inc., Pacific Coast Fisheries Corp., Fujian Pelagic

Fishery Group Co., Qingdao Zhengri Seafood Co., Ltd. and Yangcheng Yaou Seafood Co. filed a motion for judgment upon the agency record challenging various aspects of the Final Results. On May 6, 2004, the Court remanded this matter in part to Commerce with instructions to 1) include Hontex's March 2002, submissions ("Hontex's Submissions") and explain their effect, if any, on the Final Results; 2) explain why Commerce's collapsing methodology for non-market economy ("NME") country exporters is a permissible interpretation of the antidumping duty statute; and 3) explain Commerce's finding that Jiangsu Hilong International Trade Co., Ltd. ("Jiangsu") and Ningbo Nanlian Frozen Foods Company, Ltd. ("Nanlian")[1] should be collapsed. See Crawfish, 28 CIT at ___, 343 F. Supp. 2d at 1272. The Final Results were affirmed with regard to all other issues. See id.

On November 2, 2004, Commerce submitted its final remand results pursuant to the Court remand. See Final Results of Determination Pursuant to Court Remand ("Final Remand Results"). Hontex filed comments on January 31, 2005. See Comments Def.'s Resp. Remand Issued Ct. ("Hontex's Comments"). Commerce filed its response to Hontex's Comments on March 17, 2005. See Def.'s Resp.

---

[1] Hontex, d/b/a Louisiana Packing Company, is the United States based part-owner of Nanlian. Jiangsu is a separate trading company. See Final Remand Results at 34 & 37; Hontex's Comments at 32. For clarity, the Court will attribute all references to Louisiana Packing in the record as to Hontex here.

Opp'n Def.-Intervenors' Comments Upon Commerce's Final Results Redetermination Pursuant Ct. Remand ("Commerce's Resp."). CPA filed its response to Hontex's Comments on March 17, 2005. See Pls.' Resp. Def.-Intervenor's Comments Remand Determination ("CPA's Resp."). The Court heard oral arguments from the parties on May 9, 2005.

## DISCUSSION

### I. Commerce Reasonably Concluded that Hontex's Submissions Had No Effect on Its Determination

In the Final Results, Commerce rejected two submissions made by Hontex, dated March 19, 2002, and March 20, 2002, as untimely new factual information. See Crawfish, 28 CIT at ___, 343 F. Supp. 2d at 1261-62. The Court held that Commerce improperly rejected these submissions. See id. Accordingly, the Court instructed Commerce to include Hontex's Submissions in the administrative record, and "explain what bearing, if any, [Hontex's] submissions have on Commerce's final determination." Id. at ___, 343 F. Supp. 2d at 1262 (emphasis added). Commerce did so and determined that Hontex's Submissions did not alter its reasoning that the Spanish Study[2] was an unreliable source of information for valuing live

_____

[2] Estudio Sobre el Impacto Económico del Sector de Congrejo de Rio en Andalucia ("Spanish Study") was submitted by Hontex after the preliminary results were published by Commerce. See Final Remand Results at 8-9. A review of Commerce's decision finding the Spanish Study unreliable is fully described and addressed in

whole crawfish during the POR.  See Final Remand Results at 7-27. Consequently, Commerce reaffirmed its decision to use Australian data as the best available information to calculate normal value during the POR.  See id. at 18.

Hontex argues that its submissions corroborate the Spanish Study and that Commerce's continual rejection of the Spanish Study is unsupported by substantial evidence.[3]  See Hontex's Comments at 2 & 20.  In Hontex's Submissions, three Spanish companies state that they informed Commerce that the prices in the Spanish Study were an accurate reflection of crawfish prices in Spain during the POR.  See id. at 14-16.  Hontex asserts that Commerce unreasonably determined that a chart of crawfish prices included in Hontex's Submissions was not reliable enough to verify the prices used in the Spanish Study.  See id. at 17-19.  Hontex notes that the trends and price ranges reported in the chart are identical to the Spanish Study, thus further corroborating it.  See id. at 18-19.  Finally, Hontex argues that its submission of a newspaper article dated August 2001, also supports the prices used in the Spanish Study. See id. at 19-20.

---

Crawfish, 28 CIT at ___, 343 F. Supp. 2d at 1260-62.

[3]    The bulk of Hontex's comments criticize Commerce's examination of the Spanish data and decision to use Australian data.  See Hontex's Comments at 6-13 & 20-27.  Hontex does not focus on how its submissions affect Commerce's final determination.

Contrary to Hontex's arguments, the Court did not order Commerce to reconsider every aspect of its decision of whether Australian or Spanish data was the best available information to determine the surrogate value of live whole crawfish. Rather, the Court's instructions were narrower in scope. Commerce was to reconsider its decision to use Australian or Spanish data only if Hontex's submissions were so compelling that its original decision to not use the Spanish data became unreasonable. If Commerce determined that Hontex's submissions had little or no impact on its decision that Australian data was the best information available, then it could reasonably assert its original decision in the Final Results. The Court finds, based on the reasons stated below, that Commerce followed the Court's remand instructions.

Commerce concluded that while three Spanish companies stated that the prices in the Spanish Study were accurate, the Spanish Study still failed to overcome the problems Commerce identified regarding how it was structured, conducted, and verified. See Final Remand Results at 12-14. Furthermore, Commerce did not find the chart of Spanish prices to be a reliable source which independently corroborated the prices in the Spanish Study. See id. at 14-15. Commerce stated that Hontex failed to adequately explain the context in which the chart was prepared and used. See id. at 15. Commerce also found that the newspaper article "offers

no support to the argument that [Commerce] should rely on the Spanish study" because the crawfish price referenced therein are not specific to the POR. Id. at 15. The Court finds that Commerce reasonably explained how each document in Hontex's Submissions was either unpersuasive or unreliable and did not overcome Commerce's apprehension of the reliability and veracity of the Spanish Study. Commerce's explanation why Hontex's Submissions had no effect on its Final Results is reasonable and supported by substantial evidence. Accordingly, the Court holds that Commerce properly followed the remand instructions.

**II.  Commerce Properly Explained its Collapsing Methodology for NME Producers but its Decision to Collapse and Assign a Joint Rate to Jiangsu and Nanlian is not Supported by Substantial Evidence**

   **A.   Background**

In the Final Results, Commerce concluded that Jiangsu and Nanlian should be collapsed and assigned a single antidumping duty rate because the two companies did not present sufficient evidence demonstrating that their relationship was different from that which formed the basis of Commerce's original collapsing determination in the 1997-1998 POR. See Crawfish, 28 CIT at ___, 343 F. Supp. 2d at 1265. The Court determined that Commerce had not sufficiently explained which factors formed the basis of its collapsing determination. See id. Accordingly, the Court remanded this issue

back to Commerce with instructions to articulate why its NME collapsing methodology is a permissible interpretation of the antidumping statute and why its findings warranted collapsing Jiangsu and Nanlian. See id. Thereafter, the court reviewed Commerce's determination to collapse Jiangsu and Nanlian for the 1997-1998 POR in Hontex Enterprises Inc. v. United States ("Hontex II"), 28 CIT \_\_\_, \_\_\_, 342 F. Supp. 2d 1225, 1230-34 (2004),[4] and affirmed Commerce's collapsing methodology for NME producers. In the Final Remand Results, Commerce explained why its collapsing methodology for NME producers was a permissible interpretation of the antidumping statute. See Final Remand Results at 27-32. Commerce offered the same explanation for its NME collapsing methodology which was affirmed in Hontex II. See id.; see also Hontex II, 28 CIT at \_\_\_, 342 F. Supp. 2d at 1230-34.

### B. Contentions of the Parties

#### 1. Hontex's Contentions

Hontex asserts that Commerce's decision to collapse Jiangsu and Nanlian was based on Commerce's discovery of evidence at verification implying the two companies maintained a business relationship and shared Mr. Wei's services. See Hontex's Comments at 29. Hontex argues that even if both facts are true, they may

---

[4] Hontex II is currently being litigated before Judge Eaton. See Hontex Enterprises, Inc. v. United States, 29 CIT \_\_\_, 2005 Ct. Int'l Trade LEXIS 126, Slip Op. 05-116 (Aug. 31, 2005).

not reasonably be interpreted to mean a "significant potential for manipulation" of crawfish prices existed pursuant to 19 C.F.R. § 351.401(f) (2000). See id. As evidence of a business relationship between Jiangsu and Nanlian, Commerce cited invoices Jiangsu sent to Hontex during the POR for a commission based on the crawfish Nanlian purchased using information provided by Jiangsu. See id. at 30-31. Because neither company reported the interaction on their questionnaire responses, Commerce determined that Jiangsu and Nanlian's statements were evasive and did not support a finding that the two companies were no longer a single entity. See id. Hontex argues, however, that Nanlian's questionnaire response was forthright because Nanlian only exchanged information with Jiangsu once during the POR, thus it had a minor interaction with Jiangsu. See id. at 31-32. Hontex believes this minor interaction simply does not constitute a business relationship. See id. Moreover, Hontex further contends that Mr. Wei[5] provided no meaningful nexus between Nanlian and Jiangsu during the POR. See id. at 33-34.

While Hontex did not comment on Commerce's collapsing methodology for NME producers, it argues that a "significant underpinning" of Commerce's decision to collapse Jiangsu and

---

[5]     Mr. Philip Wei is an individual whom Commerce found to be a shared employee by Jiangsu and Nanlian during a prior administrative review. See Final Remand Results at 33 & 37. Commerce found that Mr. Wei continued to perform functions for both companies during the POR at issue. See id.

Nanlian for the 1999-2000 POR is its decision to collapse the two companies for the 1997-1998 POR. See Hontex's Comments at 2 & 29. Thus, if the court in Hontex II determines that Commerce's decision for the 1997-1998 POR is unsupported by substantial evidence, then Commerce's decision for the 1999-2000 POR must similarly fail. See id. at 28-29.

### 2. Commerce and CPA's Contentions

Commerce responds that neither Jiangsu nor Nanlian presented sufficient evidence demonstrating that the relationship between the two companies was different from that which formed the basis of Commerce's decision in the 1997-1998 POR. See Commerce's Resp. at 20. Commerce states that because Jiangsu and Nanlian have been collapsed in two previous reviews, "the actions of any part of that entity are attributable to the whole." Id. at 23. Once Commerce determines that two entities should be collapsed, the burden falls upon the respondent to provide substantial evidence proving that circumstances have changed. See id. at 25. Commerce argues that Jiangsu and Nanlian did not satisfy that burden here. See id.

Commerce argues that Nanlian and Jiangsu disclosed at verification that they had a business relationship during the POR, despite previously submitting questionnaire responses to the contrary. See id. at 21. Commerce determined that a business relationship existed because Jiangsu assisted Nanlian in locating

sources of crawfish, later invoicing Hontex a commission for its services. See id. at 21-22. Commerce also argues that three hotel bills that Jiangsu paid on behalf of Mr. Wei, obtained at verification, indicated a continuing relationship between Mr. Wei and Jiangsu during the POR. See id. at 22. Commerce concludes that the information obtained at verification called into question the accuracy and completeness of responses given to Commerce regarding Mr. Wei's activities. See id. at 22-23. Therefore, it reasonably determined that the pre-existing relationship between the two companies continued. See id. at 25.

CPA agrees generally that Commerce's decision to continue to collapse Jiangsu and Nanlian is supported by substantial evidence on the record. See CPA's Resp. at 4. CPA also concurs with Commerce that the Court should uphold Commerce's collapsing methodology for NME exporters. See id.

## C. Analysis

An entity from a NME country may obtain a separate antidumping rate from the country-wide rate if it can demonstrate that its export activities are independent of governmental control. See Sigma Corp. v. United States, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997); see also Final Determination of Sales at Less Than Fair Value for Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (May 6, 1991). Two NME producers independent

of governmental control, however, may be "collapsed" into a single entity if they are affiliated. See Hontex Enter., Inc. v. United States ("Hontex I"), 27 CIT ___, ___, 248 F. Supp. 2d 1323, 1342-44 (2003). The "collapsed" entity is then assigned a single antidumping margin where there is a "significant potential for manipulation" of export pricing or exporting activities. See id. Under Commerce's collapsing methodology, Commerce must determine whether two companies are affiliated under 19 U.S.C. § 1677(33)(F) & (G) (1994), meaning one company controls the other or both companies are under common control pursuant to 19 C.F.R. § 351.102(b) (2000). See Hontex II, 28 CIT at ___, 342 F. Supp. 2d at 1232. Even though two companies may be affiliated, Commerce must also show that there is a "significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(2). In addition to potential price manipulation, Commerce examines the temporal aspect of control, including the possibility that a short-term relationship could result in control. See Hontex II, 28 CIT at ___, 342 F. Supp. 2d at 1233. The Court holds that Commerce properly explained its collapsing methodology for NME producers and therefore complied with the Court's remand instructions.

In applying Commerce's collapsing methodology for NME producers, Commerce's decision to continue to collapse Jiangsu and Nanlian is not supported by substantial evidence on the record.

Commerce has failed to show how the contacts between Jiangsu and Nanlian amount to control of one over the other or over both and how the contacts had a significant potential to manipulate their prices, production, or export decisions. Commerce's determination to collapse Jiangsu and Nanlian was based on its decisions in earlier administrative reviews. See Final Remand Results at 40-41. Jiangsu and Nanlian could overcome Commerce's presumption by presenting new information or substantial evidence that they were no longer affiliated. See id. Commerce's decision to collapse Jiangsu and Nanlian in the 1997-1998 administrative review, however, is currently being litigated before the court. See Hontex Enterprises, Inc. et al v. United States, 29 CIT ___, 2005 Ct. Int'l Trade LEXIS 126, Slip Op. 05-116 (Aug. 31, 2005). The Court finds that Commerce failed to support its determination in the administrative review at issue with substantial evidence.[6] Irrespective of the earlier reviews, Commerce must independently show substantial evidence on the record supporting its decision to collapse Nanlian and Jiangsu.

Commerce argues that it discovered evidence at verification that Jiangsu and Nanlian had a continuing business relationship

---

[6] As Commerce even states, "[t]his case must be decided upon the administrative record before the Court at this time." See Commerce's Resp. at 23. The Court notes that Commerce must base its decision on clearer and more substantial record evidence than presented here.

with each other and were less than candid about the relationship in their questionnaire responses. See Final Remand Results at 37. Based on questionnaire responses that were incongruous to each company's verification report, Commerce determined that Jiangsu and Nanlian were still affiliated. Hontex characterizes Nanlian's interaction with Jiangsu as minor single interaction and certainly not a business relationship. See Hontex's Comments at 30-34. While few interactions may amount to a business relationship and a business relationship may rise to control, the Court holds that Commerce has failed to show that progression of facts here. Commerce has not sufficiently explained how the invoices from Jiangsu to Hontex warranted a determination of affiliation with Nanlian. Commerce even states that "[w]hile business relationships and advice, in and of themselves, are not indicative of the potential to control, this discovery at verification must be considered in the context of the sequence of events during the administrative review." See Final Remand Results at 40. Commerce, however, has also not explained what other events or facts support a finding of control between Jiangsu and Nanlian. The little evidence that Commerce relies upon is not reasonably adequate to support its conclusion. See Universal Camera, 340 U.S. at 477. Accordingly, the Court holds that Commerce improperly concluded that Jiangsu and Nanlian's questionnaire responses illustrate affiliation.

Furthermore, Commerce's reliance on Mr. Wei's contacts with Jiangsu and Nanlian during the POR as a factor in its collapsing decision is also not supported by substantial evidence.  Commerce states that Jiangsu paid for three hotel bills paid on behalf of Mr. Wei.  See Final Remand Results at 40.  Mr. Lee, owner of Hontex which in turn is part-owner of Nanlian, stated during verification that he still requested assistance from Mr. Wei on business matters.  See id.  Hontex asserts that Mr. Wei's only interactions with Nanlian during the POR was with regard to shrimp.  See Hontex's Comments at 34.  Again, Commerce concluded that Jiangsu and Nanlian were evasive on their questionnaire responses by stating that neither company had any connection to the other, whereas in actuality they were connected through Mr. Wei.  See Final Remand Results at 40.  While Mr. Wei may have had minimal interactions with both Jiangsu and Nanlian during the POR, Commerce has failed to show the importance of these interactions. Specifically, Commerce has not shown how Mr. Wei's contacts with one company necessarily translates to the potential to manipulate crawfish prices at the other company or over both.  The Court finds that Commerce has not shown how Nanlian and Jiangsu maintained a business relationship or shared Mr. Wei's services to support the conclusion that they were affiliated.  Accordingly, Commerce's determination to collapse Jiangsu and Nanlian is unsupported by

substantial evidence or otherwise not in accordance with law.

**CONCLUSION**

Commerce reasonably concluded that Hontex's Submissions had no effect on its <u>Final Results</u>. Furthermore, Commerce properly explained its collapsing methodology for NME producers. Commerce's decision to collapse Jiangsu and Nanlian, however, is not supported by substantial evidence. Therefore, this case is remanded again to Commerce with instructions to either: (1)(a) explain with specificity how the interactions between Jiangsu and Nanlian indicate that one company has control over the other or both, especially how the invoices from Jiangsu to Hontex created a business relationship with Nanlian during the POR, and (b) explain with specificity how Mr. Wei's contacts with Jiangsu and Nanlian demonstrate control of either company on behalf of the other or control over both; and (c) if Commerce is unable to provide substantial evidence supporting its collapsing decision then Commerce is instructed to treat Jiangsu and Nanlian as unaffiliated

entities and assign separate company specific antidumping duty margins to each using verified information on the record.


                                              /s/ Nicholas Tsoucalas
                                            **NICHOLAS TSOUCALAS**
                                              **SENIOR JUDGE**


Dated:     September 13, 2005
           New York, New York